IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

```
                                  )
RK COMPANY,                       )
     Plaintiff,                   )
                                  )
vs.                               )  No. 99 C 4261
                                  )
HARVARD SCIENTIFIC CORP.          )
d/b/a VIBRAGEN, INC.;             )
THOMAS WAITE; and                 )
DR. JACKIE R. SEE                 )  Magistrate Judge Arlander Keys
                                  )
     Defendants.                  )
                                  )
```

## MEMORANDUM OPINION AND ORDER

In 1998, Plaintiff RK Company invested $500,000 in the now-bankrupt Harvard Scientific Corporation. ("Harvard"). Plaintiff claims that Harvard knowingly made false statements and material omissions that induced Plaintiff to purchase shares of Harvard's stock. Plaintiff further claims that Dr. See, as an executive board member, control person, and sometime Chairman of the Board at Harvard should be held liable for violations of the Securities and Exchange Act ("SEA"), 15 U.S.C. secs. 78j(b), 78r, and 78t (West 2007); the Illinois Securities Act, 815 ILCS 5/12 and 5/131; the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2 (West 2007); as well as common law fraud. After almost eight years of litigation--during which time apparently uncollectible default judgments have been entered against Defendants Harvard Scientific and Thomas Waite--Defendant Dr. See is left standing alone. This Opinion finally closes the

book on this litigation. The following opinion constitutes the
Court's findings of fact and conclusions of law pursuant to Rule
52(a) of the Federal Rules of Civil Procedure[1].

## Background Facts

In approximately 1994, Harvard Scientific was developing a
product to treat male sexual dysfunction, which utilized a
pharmaceutical product developed by Dr. See called lyophilized
liposomal prostaglandin E-1 ("LLPGE-1"). Dr. See was involved in
the formulation of LLPGE-1, as well as in acquiring patents for
LLPGE-1 to treat male and female sexual dysfunction. Dr. See was
a director at Harvard from 1994 until mid-1999, though a bout
with cancer diminished his involvement with Harvard from 1996
through mid-1997.

In order to obtain approval to test its pharmaceutical
products on human beings, Harvard was required to submit an
Investigational New Drug ("IND") application to the FDA. In
October of 1997, Dr. See met with the FDA to discuss the status
of its IND. The FDA had discovered that Harvard had falsified
the findings of a 135 person study included in the IND that
Harvard had submitted to the FDA.

Despite the disastrous meeting with the FDA, Harvard issued
a press release on November 11, 1997, announcing that it had

---

[1] To the extent certain findings may be deemed conclusions
of law, they shall also be considered conclusions. Similarly, to
the extend matter contained in the conclusions of law may be
deemed findings of fact, they shall also be considered findings.

2

"accelerated its progress towards completion of Phase II/III clinical trials for the lyophilized liposomal delivery for treating male erectile dysfunction" and that Harvard intended to "release significant information to the market place in early September 1998."

On December 23, 1997, Harvard's general counsel, Alexander Walker, Jr., who had been forced to resign as director and general counsel, wrote a letter to Dr. See and Thomas Waite, Harvard's then President and Chief Executive Officer ("CEO"), in which he stated that "in my opinion, Harvard is not disclosing material information to the shareholders. For example, See has informed me, and I have relied on the accuracy of his representation, that the Phase I testing of the corporation's principle product will be audited by the Food and Drug Administration. For months I have advocated the disclosure of this fact, if it is true, and a full discussion of the impact such an audit could have on the approval process. I believe such a disclosure should be made immediately and I do not agree with the corporation's failure to make such a disclosure." (Ex. 42).

## The FDA's Investigation of Harvard

At the October 22, 1997 meeting between the FDA and Harvard, the FDA informed Dr. See that an investigation would be conducted by the FDA's Division of Scientific Investigations. The investigation would focus on the studies submitted by Harvard in

3

connection with the IND 50502 submission[2]. (Ex. 19). On November 24, 1997, Mr. Waite issued a letter to the FDA confirming that Harvard would not be conducting any clinical trials on any product without the FDA's written permission. (Ex. 21) Dr. See received a copy of this letter.

On March 9 and 10, 1998, the FDA investigated the 32-patient study referenced in Harvard's IND 50502. This 32-patient study was purportedly prepared by Drs. Sparkuhl and Williams. Following its audit, the FDA issued a Form 493 Report, concluding that the 32-patient study had no documents pertaining to the study, nor did it contain any signed consent forms. The FDA found that the study was not carried out in accordance with FDA regulations, and that there was no documented evidence of the investigator's responsibility for control of the drug under investigation. (Ex. 22).

The FDA broadened its inquiry; on March 11-13, 1998, the FDA investigated Dr. Sparkuhl concerning the improper 32-patient study, and concluded that he had not obtained IRB approval of the study prior to commencing the study, and that the consent forms he used lacked several basic elements required under FDA regulations. (Ex. 23).

On May 11-13, 1998, the FDA investigated the 135-patient

---

[2] This submission included both a 32-patient study and a 135 patient study.

study referenced in Harvard's IND 50502. As discussed above, Harvard had conceded that the study had been fabricated during its meeting with the FDA in October of 1997. The FDA barred Drs. Sparkuhl and Williams from ever conducting FDA studies again. Notably, Dr. See had hired Drs. Sparkuhl and Williams to conduct the clinical studies, even though they were inexperienced. Gorgy Dep. at p. 99. Mr. Medhat Gorgy, who had been hired to assist Harvard with the FDA process and audit, testified that he informed both Harvard and Dr. See that the Phase I studies had not been completed properly and had been rejected by the FDA before Plaintiff invested in Harvard.

**Harvard's Statements in Press Releases and SEC Forms Between November of 1997 and July of 1998.**

In addition to the November 1997 press release discussed above, Harvard filed a number of false and misleading press releases and SEC filings in 1998. In Harvard's SEC Form 10-KSB for the fiscal year ending December 31, 1997, which was filed on March 20, 1998 and amended on April 3, 27, and 28 of 1998, Harvard stated that the Phase I trials of LLPGE-1 had indicated possible benefits of the therapy, and that Harvard believed it was in substantial compliance with all material federal and state laws during a pre-Phase II clinical trial meeting with the FDA in October of 1997. Harvard's Form 10-KSB acknowledged that the FDA had questions regarding the clinical studies conducted before the

filing of the IND regarding the products' stability and chemistry. However, Harvard stated that, as a result of the meeting, it completed and forwarded to the FDA the reports requested by the FDA and expected approval to proceed to Phase II from the FDA. Dr. See's signature appears on the Form 10-KSB, and is dated March 19, 1998.

On May 11, 1998, Harvard issued a press release announcing that its pursuit of testing of the product for female sexual dysfunction would move forward in parallel with its male treatment product, and that Harvard was working with the FDA to initiate Phase I and Phase II clinical trials.

On May 13, 1998, Harvard filed its Form 10-QSB with the SEC for the period that ended March 31, 1998, in which Harvard announced plans to unveil its new proprietary treatment for female sexual dysfunction utilizing LLPGE-1. On May 27, 1998, Harvard issued a press release stating that, over the past six months, the company had made great strides in its efforts toward building a viable network for commercialization of its product and that the company was attempting to secure an alliance with a major partner to secure marketing and distribution channels on a global basis.

A June 1, 1998 press release announced that Harvard had received notification from the FDA that the agency's review of Harvard's Phase I submission data had been completed and Harvard

6

was free to initiate Phase II clinical trials for its male erectile and sexual dysfunction treatment product. On June 10, 1998, Harvard issued a press release stating that it had developed a topically applied product for treatment of male erectile and sexual dysfunction.

On June 29, 1998, RK purchased $450,000 in stock from Harvard. RK invested another $50,000 in Harvard on July 3, 1998. Harvard waited until July 16, 1999 – more than one year after RK's investment--to disclose the FDA's warning letter resulting from its inspection of Harvard and Harvard's withdrawal of its IND submission in August 1998.

## **RK'S Investment in Harvard in June and July OF 1998**

In 1998, Barbara Berry worked for Harvard as its Secretary and Chief Operating Officer. On or about June 11, 1998, Mr. Waite approached Ms. Berry to inquire whether her father, Robert Krilich Sr., doing business as RK, would be interested in investing in Harvard. Sometime between June 12th and 14th of 1998, Ms. Berry forwarded a solicitation letter and enclosures to her brother, Robert Krilich Jr.[3], who was a representative of RK. In the letter, Ms. Berry stated that Harvard was close to making a major announcement about its oral dysfunction product, and that Harvard was going through FDA approval for two of its four

---

[3] At the time, Mr. Krilich Sr. was in prison, and he and Ms. Berry had a strained relationship.

7

products. Ms. Berry also enclosed Harvard's Form 10-KSB and Form 10-QSB, as well as the above-mentioned press releases.

Mr. Krilich Jr. reviewed the information forwarded by his sister, and subsequently discussed the proposal with his father and an investment advisor from Prudential Securities. Mr. Krilich Jr. had several phone conversations with Mr. Waite about Harvard and the products that were purportedly coming to market. Mr. Waite stated that Harvard's products had been tested, worked, and were in the final stages of approval by the FDA. Mr. Waite also stated that Harvard was engaged in negotiations with pharmaceutical giants Upjohn and Pharmacia to purchase Harvard.

After reviewing all of the information, RK purchased a total of 166,667 shares of stock from Harvard on June 29 and July 3 of 1998, for $500,000.

## Mr. Waite and Dr. See's Shares of Harvard Stock

On January 13 and February 2, 1998, Mr. Waite and Dr. See, both directors and senior officers at Harvard, entered into financing agreements with Harvard, enabling them each to purchase substantial shares of Harvard's stock. Mr. Waite and Dr. See each executed promissory notes for $2,492,098 and each paid $7,901 in exchange for 790,139 shares of Harvard stock. Beginning in late May 1998, Dr. See began systematically selling his Harvard stock.

Neither Mr. Waite nor Dr. See has repaid their obligations

8

under the executed promissory notes. On May 19, 1999, Harvard
Settled Dr. See's $2.5 million note in exchange for Dr. See
returning 1,090,139 shares of Harvard stock and his waiving
alleged arrearages owed to Dr. See under the terms of his
consulting agreement with Harvard. Consequently, Harvard's total
reported assets in the 10-QSB for the quarter ending June 30,
1999 were $18,332, compared with total reported assets of
$6,868,118 stated in the 10-QSB filed by Harvard on March 31,
1998. Notably, Harvard's June 30, 1999 QSB provided that Dr. See
was in default of his financing agreement as of March 31, 1999.

In addition to the Harvard shares that Dr. See held
personally, the Anita K. Wassgren Trust, overseen by Dr. See's
wife, and Biosphere, a company in which Dr. See was a majority
shareholder, held a number of Harvard shares. Collectively, Dr.
See, his wife's trust, and Biosphere held over 43% of Harvard's
stock.

## Testimony at Trial

This Court presided over a bench trial in this matter,
between December 4, 2006 and December 6, 2006. At the trial, Dr.
Jackie See, Irwin Miller, Robert Krilich Sr., Barbara Berry, and
Robert Krilich Jr. testified. In addition, the parties entered
into evidence sections of the deposition testimony of Mr. Medhat
Gorgy, who was unavailable to testify at trial.

## Dr. Jackie See

Dr. Jackie See was the first witness called at trial. After observing Dr. See's testimonial demeanor at trial and reviewing the contradictions within his own testimony and with other evidence, the Court finds Dr. See's testimony to be totally incredible. At times, Dr. See's dishonesty was readily verifiable. For example, when asked whether Harvard had publicly explained why it was required to submit a new IND (i.e., because the FDA had determined that the previous clinical trials had been fabricated) prior to Plaintiff's investment, Dr. See pointed to Harvard's June 1, 1998 press release (Ex. 7) as proof that it had. TT[4] at 76. Plaintiff's counsel highlighted the fact that the press release selected by Dr. See did not support his claim, and Dr. See simply became evasive[5]. TT at 76-77. And when Dr. See testified at trial that urologists, Drs. Sparkuhl and Williams performed clinical trials on LLPGE-1 in April of 1998, TT at 39, he was confronted with his deposition testimony from 2003, wherein he admitted that there were no human trials in the development of LLPGE-1. TT at 41-42.

On other occasions Dr. See clumsily attempted to mislead the

---

[4] When referencing the testimony at trial from the trial transcript, the Court will cite to "TT" at a specific transcript page.

[5] Dr. See repeatedly stated that he knew Harvard had made such an announcement, he was simply unable to locate that particular press release. See, e.g., TT at 71. Plaintiff's counsel noted that no such document had been produced in evidence in this case.

Court and Plaintiff's counsel. For example, when Plaintiff's counsel asked Dr. See whether it was true "that at the October 22, 1997 meeting, the FDA told you that Harvard Scientific would have to voluntarily commit to conduct no further clinical trials until an FDA audit of the remaining purported clinical trial was complete?" TT at 81, Dr. See attempted to distance himself from the knowledge by responding that that specific conversation took place "between Dr. Hofmann, who was heading the regulatory affairs of the company, and the FDA, **not me**." *Id.* (emphasis added). However, when pressed by Plaintiff's counsel, Dr. See admitted that he was in the room with Dr. Hofmann when that conversation between the FDA and Dr. Hofmann took place. *Id.*

Other testimony was so unbelievable that the Court will not require contradictory evidence to find the testimony incredible. For example, Plaintiff's counsel was attempting to force Dr. See to admit that he had at least read certain Harvard press releases before they were published. TT at 136-138. Counsel posited that, since the evidence demonstrated that Dr. See had approved the first and third paragraphs of Harvard's June 5, 1998 press release (Ex. 8), the Court should then presume that Dr. See had read the second paragraph (which contained admittedly false information) as well. TT at 138. Remarkably, Dr. See admitted to reading and approving the first and third paragraphs of the June 5th press release, but claimed that he had not read the now-

obviously false second paragraph of the June 5th press release[6].
TT at 138.  Having made its credibility determination, the Court
turns to the substance of Dr. See's testimony.

At trial, Dr. See painted his role at Harvard as limited to
overseeing intellectual property and patent development.  TT at
134.  He denied that he was the founder of Harvard Scientific,
but acknowledged that Harvard's SEC filing (Ex. 2), which Dr. See
had signed, stated that he was Harvard's founder.  TT at 25.  Dr.
See admitted that he was Harvard's President from 1994 until
1996, and that he was on Harvard's Board of Directors and
Management Committee, and Dr. See acknowledged that he had signed
SEC documents to that affect.  TT at 27-31.

Dr. See was quick to point out that, from 1996 until
sometime in 1997, he was battling cancer and undergoing radiation
therapy and other treatments.  Nevertheless, Dr. See was
admittedly back working at Harvard by October of 1997, and
certainly throughout 1998.  Dr. See admitted that only he and Mr.
Waite were on the Executive Committee in 1998, TT at 51, and that

---

[6] Dr. See claimed that he only received those sections of
Harvard's press releases that related to intellectual property
and the development of the pharmaceutical agent.  TT at 139.
When Plaintiff's counsel asked, "once it [the entire press
release] was drafted, [Tom Waite would] send it back to you for
approval, correct?"  Dr. See stayed firm and replied "No."  Only
when Plaintiff's counsel pressed the issue and asked "So you
actually didn't even approve the language that was used in the
press releases regarding the areas that you felt you were
responsible for?" did Dr. See admit "No, he was good about
following that, that direction." TT at 140

12

he, along with the Anita Wassgren Trust and Biosphere, were Harvard's largest shareholders. TT at 53.

Dr. See acknowledged that Harvard documents showed that he was to purchase 790,000 shares of Harvard stock in exchange for a payment of 1 cent per share and a note to pay $2.5 million, but claims that he never received the shares[7]. TT at 47.

Although he denied any familiarity with FDA procedures, he was quick to correct Plaintiff's counsel on FDA procedure. TT at 60-62. Dr. See admitted that Drs. Williams and Sparkuhl's 32-patient study was performed without informed consent, that he learned of this on October 22, 1997, TT at 77-78, and that he was certainly aware of it by the time the Harvard press release claiming FDA success came out on June 1, 1998 (Ex. 7). TT at 78. Similarly, Dr. See admitted that Harvard's press releases indicating that its sexual dysfunction drugs would be coming to market, TT at 82, and that the company was working with the FDA to initiate Phase 2 and Phase 3 clinical trials, TT at 85, were false. TT at 85-86. Nevertheless, Dr. See maintained that he was not responsible for issuing press releases or supervising the FDA process.

Dr. See also admitted that he knew that Harvard's May 11, 1998 press release (Ex. 5) was false. TT at 133. Even more

---

[7] Of course, Dr. See fails to explain how he secured the approximately $3 million of Harvard shares that he sold. TT at 50.

damaging was Dr. See's admission that he had read Harvard's June 5, 1998 press release stating that Harvard's product would begin shipping on a global basis - before the press release was issued-and that he knew that statement to be false at the time it was made. TT at 135.

Dr. See admitted that, even though he knew there were no ongoing trials in 1998, TT at 147, he never made that information public. TT at 148. He acknowledged that, after Harvard's counsel, Alexander Walker, was forced to resign, Mr. Walker sent a letter (Ex. 42) to both Dr. See and Mr. Waite calling for them to disclose adverse material information. TT at 152. Dr. See claims he didn't read the letter because it was also addressed to Mr. Waite, but then conceded that Mr. Walker sent one letter to Mr. Waite in Florida and another letter to Dr. See in California. TT at 152.

Dr. See also admitted that he instructed Barbara Berry to obtain his approval before reimbursing any of Mr. Waite's business expenses, because Mr. Waite was (in Dr. See's opinion) spending excessively in Florida. TT at 162. Finally, Dr. See acknowledged that he sold close to $3 million worth of Harvard stock on behalf of himself, the Anita Wassgren Trust and Biosphere. TT at 165.

## Irwin Miller's Testimony

To accommodate Mr. Miller's schedule, the Court allowed counsel to examine Mr. Miller prior to Dr. See's cross examination. Notably, defense counsel objected to much of Mr. Miller's testimony, because Mr. Miller did not begin working with Harvard until April of 1999 – almost one year after Plaintiff made its investment. The Court permitted the testimony over Defendant's objection.

At trial, Mr. Miller testified that, in April of 1999, he met with Dr. See, Dr. See's lawyer[8], and Mr. Miller's son about taking over as CEO of Harvard. TT at 93. Mr. Miller explained that, at that time, Dr. See was Harvard's Chairman, was on Harvard's Board of Directors, and was "in charge of anything having to do with product." TT at 94. Mr. Miller claimed that Dr. See was also in charge of making certain that the product went through FDA trials, as he was the only individual at Harvard that had a pharmaceutical background. *Id*. Mr. Miller explained that, once hired, he reported to the Board of Directors, which consisted of Dr. See, Mr. Curtis Orgill, and Mr. Gordon Cole. *Id*. Even though there were three directors, it was clear to Mr. Miller that Dr. See was more involved than the others with Harvard and its products. TT at 95.

Mr. Miller testified that, as Harvard's CEO, he was

---

[8] On cross examination, the attorney was identified as Mr. Pizzulli, who may have also had some involvement with Harvard, and not just Dr. See personally. TT at 121.

responsible for generating funds for the corporation. Mr. Miller was angered by the fact that Dr. See was systematically selling off his stock at a time when Mr. Miller was trying to promote Harvard to investors, and Mr. Miller felt that Dr. See was sabotaging his efforts. TT at 97. Mr. Miller noted that some of the stock was being sold by Biosphere, and that it was his understanding that Biosphere was Dr. See's company. TT at 97.

Mr. Miller testified that Dr. See's approval was required before Harvard could issue press releases, and that Dr. See was the only individual at Harvard with any knowledge of the pharmaceutical process. TT at 98, 100. Mr. Miller testified that Dr. See approved all SEC filings, as well. TT at 99. Mr. Miller testified that, based on his review of business documents that predated his tenure, anything of any importance at Harvard required Dr. See's approval. TT at 99-100. When Harvard received a warning letter from the FDA, dated May 18, 1999 (Ex 28), Dr. See was substantially involved in drafting Harvard's response. TT at 100-101. Mr. Miller explained that, despite the rosy statements contained in the press releases in May and June of 1998, no clinical studies of any kind were performed while he was with Harvard.

On cross-examination, Mr. Miller denied that Dr. See was selling his shares for Harvard's benefit, TT at 116, stated that Dr. See was not putting any of the proceeds from the stock sale

16

back into Harvard, TT at 131, and that, after Mr. Miller objected
to the stock sell-off, Dr. See finally stopped. TT at 130. Mr.
Miller testified that, by the time he arrived at Harvard in mid-
1999, Harvard did not have any full-time staff, and that he was
not paid regularly. TT at 122. Mr. Miller also testified that
Dr. See resigned as a director of Harvard in July of 1999.

## Robert Krilich Sr.'s Testimony

Mr. Krilich testified that he first heard of Harvard in late
1997, when he learned that his daughter, Barbara, had begun
working for the company. TT at 189-190. Mr. Krilich testified
that his daughter contacted him in June of 1998 with an
investment opportunity. Barbara Krilich wrote that, if Mr.
Krilich invested $600,000 in Harvard, he would be able to
purchase the shares (which were purportedly trading at almost
$8/share[9]) for only $3/share. TT at 190-91. Mr. Krilich
testified that he, his wife, his son (Robert Krilich Jr) and Mr.
Kim Plesner[10] reviewed the letter, along with the Harvard press
releases, SEC filings, and financial statements that Barbara had
forwarded. TT at 192. Mr. Krilich asked his son Robert to
research and verify the information that Barbara had forwarded.
TT at 195.

---

[9] The stock was trading at $7.75 as of March 18, 1998. TT at
205.

[10] Mr. Krilich explained that Mr. Plesner was running the RK
Company at the time. TT at 192.

17

Mr. Krilich testified that he relied upon the press releases in deciding to pursue the investment with Harvard. TT at 197-208. Mr. Krilich testified that his son told him that he had spoken to people at Harvard, who had confirmed that Harvard was in negotiations with pharmaceutical companies to purchase Harvard, and that this information was consistent with the information his daughter, Barbara, had forwarded to him. TT at 199-200. In addition to the press releases that Barbara had forwarded to him on June 11, 1998, Mr. Krilich testified that he also reviewed press releases dated June 11 and 12, 1998, explaining that they had been forwarded to him after he received Barbara's letter, but before RK made the investment. TT at 203.

Mr. Krilich also relied upon Harvard's first quarter filing, which had been forwarded to his son Robert by someone at Harvard, after Robert had begun researching the investment. TT at 208. Mr. Krilich testified that Robert had spoken to both Mr. Waite and Dr. See about Harvard partnering up with a pharmaceutical company. TT at 211. Mr. Krilich testified that he was so impressed by the information in the press releases and SEC filings, that he wished he had more than $500,000 to invest in Harvard. TT at 205. Mr. Krilich made the investment via the RK company, which Harvard University professor Edward Bartolli had set up for Mr. Krilich as an investment vehicle. TT at 226. Mr. Krilich also stated the obvious, explaining that he never would

18

have invested in Harvard had he known the truth. TT at 212-13.

Mr. Krilich testified that RK had difficulty trying to sell the Harvard stock. He explained that RK attempted to sell the Harvard stock with Prudential Securities, but they were unable to find a buyer for the shares, unless RK was willing to post a bond to guarantee the shares. TT at 213-14.

On cross-examination, defense counsel questioned Mr. Krilich about the RK company in connection with the motion he filed that very morning, seeking to have judgment entered in favor of Dr. See, because Plaintiff's Amended Complaint purportedly named the wrong Plaintiff. TT at 219. When asked what type of company RK Company was, Mr. Krilich stated that he was unaware of the "legal semantics of it" and that it was set up for investment purposes. TT at 225.

Counsel then moved on, and attempted to discredit Mr. Krilich's claim that he had actually read and relied upon the press releases, SEC statements, and financial statements described above. Defense counsel chided Mr. Krilich for claiming to have reviewed Harvard's press releases and filings, but overlooking the fact that the Harvard stock certificates were issued to "**R.K.** Company" (with periods) instead of to the "**RK** Company" (no periods). TT at 229-230. Mr. Krilich didn't bite, and insisted that he had reviewed the relevant press releases and SEC filings. Id.

Mr. Krilich admitted that, because he was in prison at the time for a federal bribery conviction, he was not able to conduct thorough due diligence on his own, instead relying upon his family to follow up on the information that Barbara had sent. TT at 236. But when counsel asked Mr. Krilich how many FDA phases had to be completed before a product could be marketed, he admitted that he didn't know. TT at 237.

Mr. Krilich also conceded that the stock he received from Harvard expressly stated that they were restricted securities, but claimed that he had been assured prior to investing that the Harvard shares could be freely traded. TT at 240-41. In an effort to undermine causation, defense counsel began asking Mr. Krilich about RK's initial efforts to sell its stock, within 30 to 60 days after its investment, when Harvard was still trading well. Counsel repeatedly asked Mr. Krilich whether anyone from Prudential or anywhere else had told him that he could not trade the Harvard stock because of purportedly false press releases or SEC filings, and Mr. Krilich admitted that he could not recall being given such an explanation within 30 days of purchasing the Harvard stock. TT at 243-47.

Mr. Krilich testified that initially, he was hopeful that RK would be able to "flip" the Harvard stock for a profit, but "whether it would be a short period of time or a longer period of time, as long as the stock was doing what most stock people would

hope the stock would be doing." TT at 248. Mr. Krilich
conceded that he would not have purchased the Harvard stock if he
had to pay the then market value for the stock. TT at 255.

Mr. Krilich testified that RK invested a total of $500,000
in Harvard at the discounted share price of $3/share, even though
his daughter, Barbara, had initially informed his that the
discounted share price would be reserved for investors purchasing
$600,000 worth of shares. TT at 265-66. RK purchased the shares
in two installments, first $450,000 and then $50,000, and he was
not aware in the summer of 1998 that Harvard had paid his son,
Robert Jr., a finder's fee of $50,000. TT at 265-267. Mr.
Krilich testified that he had asked his daughter, Barbara,
whether she had received any compensation from Harvard in
connection with RK's investment, and that she replied that she
had not. TT at 270. While Mr. Krilich understood that the
information in the press releases were not statements of fact, he
considered them to contain valid information. TT at 270-71.

## Ms. Barbara L. Berry's Testimony

Ms. Berry began working as a consultant for Harvard in
September of 1997, and was hired as an employee two months later.
TT at 279. She was responsible for balancing the bank
statements, reconciling the accounts and consolidating the
accounts into the financial statements, which were ultimately
included in the SEC filings. TT at 279. Harvard attorney David

21

Baker was also involved in compiling the SEC statements. TT at 280.

When she began working for Harvard, Mr. Alex Walker was the company's corporate counsel and a director, and Don Steffens and Dr. See were directors. TT at 278. Ms. Berry explained that, after Mr. Walker left, Mr. Thomas Waite was hired to replace him. TT at 278-79. Ms. Berry testified that, until the time she left in March of 1999, Dr. See was Chairman of the Board at Harvard, as well as the Director of Research and Development. TT at 280-81. Dr. See was on the management committee of Harvard's Board of Directors, and, with his affiliated companies, he was Harvard's largest shareholder. TT at 281.

When asked about Dr. See's electronic signature on an SEC filing, Ms. Berry explained that a company known as EDGAR[11] required companies to submit their SEC information to them – with actual signatures – and then EDGAR would convert the entire filing into an electronic filing. TT at 281-83. Ms. Berry clarified that she would not submit a document to EDGAR unless she had obtained all of the necessary signatures. TT at 283.

Mr. Berry confirmed that Dr. See controlled 43/8% of

---

[11] EDGAR is the electronic system that converts documents from Word or Excel and translates them into a format that can be posted onto the Securities and Exchange Commission's website. TT at 282.

22

Harvard's shares- making him and his affiliated companies[12] Harvard's largest shareholders. TT at 287.

Ms. Berry testified that Mr. Waite had approached her about soliciting an investment from her father in mid-1998. He explained that her father could buy unrestricted shares for only $3/share, if he were willing to invest upwards of $600,000. TT at 290-91. Ms. Berry testified that she felt confident recommending the investment, particularly since an employee of Goldman Sachs had invested approximately $2 million in Harvard. TT at 293.

Ms. Berry testified that she had reviewed and then forwarded Harvard's press releases from May and June of 1998, as well as Harvard's SEC statements in compiling the letter to her father and brother. TT at 295-97. Ms. Berry could not confirm whether she later forwarded Harvard's June 11 and 12, 1998 press releases to her brother or father. TT at 298-99. Ms. Berry explained that her brother, Robert Krilich Jr., had received a 10% finder's fee for securing RK's investment, and that the fee was consistent with other fees that Harvard had paid to individuals bringing in investors. TT at 301.

Ms. Berry testified that Dr. See approved all SEC filings that she had been involved with, as well as signing Harvard's annual report. TT at 301. Dr. See did not sign Harvard's

---

[12] Specifically, the affiliated companies were Biosphere Technology ("Biosphere") and the Anita Wassgren See Trust. TT at 287.

23

quarterly reports, but Ms. Berry testified that she sent to Dr. See and Mr. Waite the sections of each of those quarterly reports that involved anything science related, including patent filings and FDA approvals, and that they would annotate the reports and return them to her for editing. TT at 302. Ms. Berry testified that Dr. See did initial the quarterly reports, TT at 303, and that she recognized his signature and his initials from their frequent business dealings. *Id.*

Ms. Berry also testified that the press releases were created primarily by Mr. Michael Snell, and also by Mr. Waite and Dr. See. All press releases had to be approved by both Dr. See and Mr. Waite before Mr. Snell was permitted to publish the releases. TT at 304. This procedure was in place during her entire tenure at Harvard, including in May and June of 1998. *Id.* Ms. Berry verified that the press releases she sent to her father and brother had been approved by Dr. See. TT at 305.

Ms. Berry further contradicted Dr. See's testimony by testifying that Dr. See was aware of RK's investment in Harvard at the time it occurred, and that Dr. See called Ms. Berry to express his appreciation for the investment. TT at 307. Ms. Berry explained that the call stuck out in her memory, because most of her communications with Dr. See was via fax; if she needed to communicate with Dr. See, she would typically call Mr. Waite and ask him to have Dr. See call her. TT at 308. Ms.

24

Berry explained that from September to November of 1997, Harvard's offices were in Irvine, California, and that Dr. See visited the offices a few times each week. After Harvard moved its offices to Reno in November of 1997, however, her personal contact with Dr. See was limited. TT at 309. Nevertheless, Ms. Berry testified that Dr. See remained Chairman of Harvard's Board, that Dr. See oversaw Mr. Waite, and that Dr. See was in charge of all research and development, as well as information involving the patents and the FDA. TT at 309.

Ms. Berry testified that Dr. Goldstein was charged with conducting the clinical trials, and that Dr. See was overseeing his work. TT at 310. Ms. Berry also recalled that Mr. Medhat Gorgy visited the Reno office where the FDA files were kept in a locked file cabinet, and that he was accompanied by an individual from the FDA. *Id.* Ms. Berry testified that, after the visit, Mr. Waite informed her that Harvard had received FDA approval with regard to its Phase I studies. TT at 310-11.

Ms. Berry testified that she was Harvard's Chief Operating Officer, and that Dr. See was the individual primarily involved in running the company. TT at 314-16. Ms. Berry testified that Dr. See controlled Harvard's finances, TT at 316, that Dr. See's approval was required for transfers of moneys from Harvard's money market to its checking accounts, and that Mr. Waite's

expenditures[13] had to be approved by Dr. See. TT at 317.

Ms. Berry testified that Dr. See's salary from Harvard was between $160,000 and $180,000. Ms. Berry also explained that certain Harvard documents indicated that Dr. See, Biosphere and the Anita Wassgren Trust had generated approximately $2.4 million from the sale of Harvard stock between March of 1996 and January of 1998. TT at 320.

On cross examination, Ms. Berry admitted that she did not personally witness Dr. See approve press releases. TT at 348-49.

## Mr. Robert Krilich Jr.'s Testimony

Mr. Krilich Jr. testified that, in addition to the materials that Barbara had forwarded to him on June 11, 1998, someone from Harvard had faxed him Harvard press releases dated June 11 and June 12, 1998. TT at 363. Mr. Krilich believed that Mr. Waite was the individual that forwarded the information (TT at 366) and that he read and relied upon those documents in recommending the investment. TT at 363-67.

Mr. Krilich Jr. testified that he had spoken to Harvard officers between six and twelve times before recommending the investment. TT at 368. While he typically spoke with Mr. Waite, Mr. Krilich Jr. recalled at least one phone conversation with Dr.

_____

[13] Dr. See felt that Mr. Waite's corporate spending was tangential and excessive, so he demanded that his approval be obtained before Mr. Waite could be reimbursed by Harvard. TT at 317-18.

See. *Id.* Mr. Krilich Jr. explained that, during a phone conversation with Mr. Waite, Mr. Krilich Jr. asked to speak with Dr. See. TT at 369. Mr. Waite conferenced in Dr. See, immediately introduced Mr. Krilich Jr., and the three discussed Harvard's negotiations with pharmaceutical companies and the clinical trials with the FDA. TT at 369-71.

On cross-examination, Mr. Krilich Jr. admitted that the Harvard shares were still "trading strong" one month after RK had made its investment, and that RK had tried to sell its shares at about that time. TT at 388. RK sought Prudential's services in selling the stock, but Prudential was experiencing difficulty in doing so. Mr. Krilich Jr. contacted Mr. Waite about Prudential's inability to sell the shares, and Mr. Waite suggested that perhaps Prudential was the problem. TT at 388. Mr. Krilich Jr. testified that he contacted Mr. Bill Anderson at Prudential to ask him why other people were able to unload their Harvard stock, but Harvard could not. TT at 398. Mr. Krilich stated that Mr. Anderson explained that RK would be required to post an $800,000 bond to trade the shares. TT at 398-99.

## The Deposition of Medhat Gorgy

Because Mr. Gorgy was unavailable to testify at trial, the Court received and reviewed his deposition testimony, taken on July 15, 2004. Mr. Gorgy has been the President and CEO of Pyramid Laboratories ("Pyramid") since approximately 1988.

27

Pyramid provides contract, manufacturing, and analytical services for biotech and pharmaceutical companies. Gorgy Dep. at 13. Mr. Gorgy assisted Harvard during the FDA audits in 1998, and stated that he was in constant touch with Dr. See during those audits. Gorgy Dep. At 38-39. The FDA notified Mr. Gorgy on July 28, 1998 that it did "not look good for Harvard to proceed with Phase I." *Id.* at 39. Mr. Gorgy claims that, when he informed Dr. See of the FDA's remarks, Dr. See seemed to take it personally, and that communication between Dr. See and Mr. Gorgy(as well as Pyramid) broke down after that time[14]. *Id.* at 40.

Mr. Gorgy explained that Harvard was initially known as Biosphere. *Id.* at 53. Max Carter of Biosphere/Harvard had initially approached Mr. Gorgy about performing analytical work development, validation, and stability studies in June of 1997. *Id.* Later, Harvard approached Mr. Gorgy about taking over the review and submission of the INDs. *Id.* at 65. Mr. Gorgy explained that he communicated predominantly with Mr. Waite about the submissions and with Dr. See about anything technical, and that he attended the FDA audits with Dr. See. *Id.* at 70-71.

After the March inspections, the FDA raised a number of

---

[14] Another source of contention between Mr. Gorgy and Dr. See is the fact that Mr. Gorgy contested Dr. See's claim that he had invented LLPGE-1. Gorgy Dep at 62-63.

concerns and problems[15] with Harvard's INDs in May of 1998. Mr.
Gorgy drafted a response to the FDA's concerns on June 3, 1998,
and sent a copy of his response to Dr. See. *Id.* at 82. Mr. Gorgy
had numerous conversations with Dr. See about the submission of
the INDs, *id.* at 84, about the efforts to bring their drugs to
market and the finances involved. *Id.* at 86.

Mr. Gorgy's testimony painted Dr. See as being fully
informed of the troubles with the FDA. Mr. Gorgy stated that
Dr. Jackie See was well aware before June 29, 1998 that at no
time were the products adequately studied as far as Phase I was
concerned. *Id.* at 102. Mr. Gorgy reviewed several of the Harvard
press releases published in May[16] and June [17]of 1998, and claimed
that Harvard's statements therein were largely false and/or
misleading *Id.* at 132-45. Mr. Gorgy also explained that, while
the FDA informed Harvard on July 28, 1998 that it could
simultaneously conduct their Phase I and Phase II studies,
Harvard's press release indicating as much in June of 1998 was

---

[15] Specifically, the FDA raised 12 issues that were troubling
for Harvard. Gorgy Dep. at 79-81.

[16] For example, Harvard's May 1, 1998 press release stated
that a new product for treating female sexual dysfunction would
be unveiled and that toxicity studies were planned and expected
to begin shortly. Mr. Gorgy labeled the statements false. Gorgy
Dep at 132.

[17] Mr. Gorgy labeled Harvard's June 10, 1998 press release
(Ex 9) describing its topical treatment for male erectile
dysfunction as "incredible " Gorgy Dep. at 142-43.

utterly false at that time, because the approval did not come until weeks later. *Id.* at 138. Mr. Gorgy also claims that Dr. See lied to him about his role in the fabricated 135-patient study. *Id.* at 87.

Mr. Gorgy stated that Mr. Waite and Dr. See were responsible for putting together the press releases[18]. *Id.* at 143. Mr. Gorgy explained that Mr. Waite and Dr. See concocted press releases out of thin air, discussing potential products or ideas that excited them, and then issuing a corresponding press release. *Id.* at 145. Mr. Gorgy explained that the purpose of the press releases was to raise funds and to get people to invest in Harvard. Although he was aware of the brainstorming, Mr. Gorgy claims that he was unaware, until after the fact, that Harvard had actually issued the false press releases. *Id.*

Mr. Gorgy also testified that Dr. See and his son, Dr. Darryl See, who also began working with Harvard and Biosphere, spoke nearly everyday, and that Darryl See kept his father apprised of almost everything he was doing at Harvard. *Id.* at 148.

---

[18] For example, Mr. Gorgy claimed that he heard Dr. See and Mr. Waite specifically create the June 10, 1998 press release describing the topical treatment for male erectile dysfunction (Ex. 9) – Mr. Gorgy agreed that the statement was an utter fabrication. *Id.* at 143.

30

## Conclusions of Law

Before addressing the six counts in Plaintiff's Complaint, the Court notes that venue is appropriate in this jurisdiction pursuant to 28 U.S.C. § 1391, because the acts and transactions complained of occurred in substantial part in this district, including Defendants' offer and sale of Harvard securities to Plaintiff, by means of the U.S. mails and telephone, to Plaintiff's offices located in this district.

In addition, the Court finds that Defendant has waived his claim that he is entitled to judgment because "RK Company" is not the real party in interest. *Rogers v. Samedan Oil, Corp.*, 308 F.3d 477, 483-84 (5th Cir. 2002)(claim raised the day before trial is waived). "An objection of real party in interest grounds should be raised with reasonable promptness in the trial court proceedings. If not raised in a timely or reasonable fashion, the general rule is that the objection is deemed waived." *United Healthcare Corp., v. American Trade Ins. Co., Ltd.,* 88 F.3d 563, 569 (8th Cir. 1996); *see also Lee v. Deloitte & Touche LLP,* 428 F. Supp.2d 825, 830-31 (N.D. Ill. 2006)(Judge Filip ruled that "[o]bjections to standing based upon prudential considerations are waived if not timely raised.") This case being filed approximately seven years ago, and the information being available to the public and ascertainable in discovery, Defendant's claim made in the midst of trial is waived. *See*

*Rogers*, 308 F.3d at 484 ("Although Lexington claims it had no knowledge that Commercial Underwriters contributed to the settlement, Lexington had ample opportunity to conduct discovery on this issue.") *See generally, Levenfeld v. Boyd, 2003 WL 22532801*, at *5-6 (N.D. Ill. 2003) (rejecting defendant's standing challenge where the plaintiff was the de facto purchaser.)

**Count I- Violation of § 10b of the SEA, 15 U.S.C. § 78j(b)**

In order to establish a violation of § 10b and Rule 10b-5, RK must demonstrate that: 1) Dr. See made a false statement or omission; 2) of material fact; 3) with scienter; 4) in connection with the purchase or sale of securities; 5) upon which RK justifiably relied; and 6) that false statement or omission proximately caused Plaintiff's damages. *Otto v. Variable Annuity Life Insurance Co.*, 134 F.3d 841 (7th Cir. 1998). An analysis of these elements and the evidence presented at trial supports judgment for Plaintiff.

**A. Dr. See Made False Statements and Omissions of Material Facts with the Requisite Scienter**

In this case, the Court finds that Dr. See knowingly made false statements of material facts and failed to make material disclosures regarding Harvard. Specifically, a Harvard press release dated May 11, 1998 stated that Harvard's pursuit of its product for the treatment of female sexual dysfunction would move

32

forward in direct parallel with its male treatment product, and that Harvard was working with the FDA to initiate Phase II and Phase III clinical trials in males and would begin toxicity studies in female animals in three to four weeks. At trial, Dr. See admitted that the May 11th press release was false, at least to the extent that it referenced Phase III trials. *See* Trial Trans. at p. 133. In addition, the evidence at trial demonstrated that the statements contained in the press release were false; contrary to the statements in the press release, the FDA had suspended all clinical trials and Harvard had not even created a product for the treatment of female sexual dysfunction.

Similarly, Harvard's June 1, 1998 press release claimed that the FDA's review of the Phase I test data had been completed and that the company was free to initiate Phase II trials. This press release neglects to mention that the FDA had rejected Harvard's Phase I trials, and that the FDA had not authorized Harvard to conduct Phase II trials. A June 5, 1998 press release referenced ongoing clinical trials - even though there were no such clinical trials at the time - and Harvard's intention to ship its product on a global basis, as there were no immediate plans for such shipments.

With regard to material omissions, the Court finds that Dr. See failed to disclose that, during an October 22, 1997 meeting with the FDA, Harvard acknowledged that the 135-patient study

33

included in Harvard's 50502 IND submission was misrepresented and
had actually not been performed.   Also, the FDA indicated that
the 12-patient study included in Harvard's 50502 IND submission
was not conducted under any required Institutional Review Board
("IRB") approval or an IND and that neither of these studies were
ever published or submitted for publication.   Dr. See's
associate, Mr. Lawrence Hofmann, admitted to the FDA that the two
studies never occurred.   The FDA informed Dr. See that the FDA
would be conducting an investigation into the studies submitted
by Harvard in connection with their IND 50502 submission.

        These statements were clearly material because they spoke
directly to the status of Harvard's key products – products that
required FDA approval before they could be sold and return a
profit.   Harvard's statements from December of 1997 through June
of 1998 indicated that Harvard's products were sailing through
the critical FDA process when, in fact, the products' chances for
FDA success looked grim.

        Ms. Berry testified that Dr. See's approval was required
before any Harvard press releases were published, while Mr. Gorgy
testified that Dr. See and Mr. Waite were largely responsible for
creating the press releases.   Both witnesses' statements are
consistent with Mr. Irwin Miller's testimony about Harvard's
operations in 1999.

        The Court also finds Plaintiff's evidence of scienter

persuasive. "The requisite scienter is 'an extreme departure
from the standards of ordinary care, [] which presents a danger
of misleading buyers or sellers that is either known to the
defendant or is so obvious that the actor must have been aware of
it.'" *See McConville v. United States Securities Exchange
Commission*, 465 F.3d 780, 788 (7th Cir. 2006)(quotations
omitted). Dr. See's conduct was clearly a departure from the
standards of ordinary care, because he allowed to be published,
in both press releases and SEC filings, statements that he knew
to be false. Although Dr. See claimed that he only reviewed
subsections of press releases that related directly to Harvard's
patents and intellectual property, the Court finds that testimony
to be totally incredible. In addition, Dr. See's claim is belied
by the testimony of Ms. Berry, who claimed that Dr. See reviewed
all press releases, Mr. Medhat Gorgy, who testified that Dr. See
was intimately involved in running the company, and the testimony
of Irwin Miller, who testified that, to the best of his
knowledge, Dr. See had always retained control of all important
aspects of Harvard. To the extent that any of these witnesses'
testimony contradicts that of Dr. See, their testimony, not his,
is credited.

   Any ambiguity in Dr. See's mind regarding Harvard's duty to
disclose the truth should have been resolved when Dr. See
received a letter dated December 23, 1997, from Alex Walker Jr.,

Harvard's former counsel, who informed both Dr. See and Mr. Waite that Harvard should disclose the information regarding the FDA's pending audit immediately. In addition, Mr. Walker explained that Harvard's December 11, 1997 press release, which denied the existence of any class action suits by shareholders, was misleading, in light of pending litigation. Mr. Gorgy's testimony that Mr. Waite and Dr. See concocted the overly optimistic press releases to raise funds for Harvard was the nail in Dr. See's coffin. Mr. Walker's letter and Mr. Gorgy's testimony convince the Court that Dr. See was not only reckless in permitting the publication of Harvard's false press releases and SEC filings, *see Fujisawa Pharmaceutical Co., Ltd. v. Kapoor*, 1999 WL 543166, at *6 n.5 (N.D.Ill. July 21, 1999) (evidence of recklessness is sufficient to establish scienter under Rule 10b-5), but that he acted knowingly.

## B. RK Relied Upon Harvard's Statements in Deciding to Purchase the Securities, And RK Suffered Damages

At trial, Ms. Berry testified that she sent the press releases and SEC filings described above to her brother, Mr. Robert Krilich Jr., for the purpose of soliciting RK's investment. Messrs. Robert Krilich Sr. and Jr. both testified that they relied upon these representations, as well as the fact that Harvard offered to sell them the shares - that were trading for almost $8 per share at that time -- for only $3 per share, in deciding to invest in Harvard.

Dr. See makes much of the fact that Plaintiff's investment decision was motivated more by a desire to make a quick profit, than Harvard's long-term vitality. However, the Court is persuaded that the rosy picture painted by the press releases and SEC statements played a material role in RK's decision to invest. Both Messrs. Krilich Jr. and Sr. conceded that the discounted purchase price caught their attention; however, both men testified that they would not have invested in the company had they known that the projections were false and that the products mentioned were nowhere near ready to go to market. The statements in these press releases and SEC filings weren't merely hopeful projections, they were blatantly false and misleading. And the evidence indicates that Harvard issued these press releases and false filings for the purpose of inflating, or at least maintaining, the value of Harvard's shares, thereby enabling both Dr. See[19] and Mr. Waite to realize a substantial profit in selling the Harvard shares that they held.

With regard to damages, the evidence clearly demonstrates that in June and July of 1998, RK paid $500,000 for shares that

_____

[19] As discussed above, Dr. Jackie See was the largest shareholder in Biosphere Technology, Inc., which owned 22% of Harvard stock at the end of 1997. In addition, Dr. See's wife, Anita K., controls the Anita Wassgren Trust, which also owned significant shares of Harvard stock. Dr. See liquidated not only the shares of Harvard stock issued in his own name, but also the Harvard stock held by Biosphere Technology and the Anita Wassgren Trust.

37

were essentially valueless by July of 1999. Dr. See contends that, had RK been successful in its efforts to sell its Harvard stock in August of 1998, it would have realized a substantial profit, not a loss. Dr. See then hints that RK's inability to sell the Harvard stock was attributable to Messrs Krilich Jr. and Sr.'s criminal records, and not a deficiency with the stock itself. However, while Plaintiff has produced testimony from Messrs. Krilich Jr. And Sr. that RK's inability to sell the stock arose from restrictions on the shares, Dr. See has presented nothing but speculation that the blame rested with RK. The evidence clearly shows that, as an accurate picture of Harvard was made public, the value of Harvard's shares plummeted.

After reviewing all of the evidence the Court finds in favor of Plaintiff RK on Count I of the Amended Complaint.

## Count II- Violation of § 18 of the SEA, 15 U.S.C. § 78r

Section 18 of the SEA creates private remedies for false or misleading statements contained in any application, report, or document filed with the SEC in favor of a person who, in reliance on such statement, purchased or sold security at a price affected by the statement. 15 U.S.C. § 78r. The success of RK's claim under this section depends upon its ability to prove that it relied upon false or misleading statements made by Harvard, which affected the price of Harvard's shares. *Id.* In order to hold Dr. See liable for Harvard's statements, however, RK must also

38

prove that Dr. See signed a document filed with the SEC that contains misrepresentations or omissions. *See F.N. Wolf & Co., Inc. v. Estate of Neal,* 1991 WL 34186 (S.D.N.Y. 1991).

As the Court concluded above, the evidence demonstrates that RK relied upon Harvard's false and misleading press releases and SEC filings in deciding to invest in Harvard. The statements enabled Dr. See to sell his Harvard shares at an inflated value. When a more accurate picture of Harvard became public in the months that followed RK's investment, the value of Harvard's stock plummeted.

In addition, the documentary evidence shows that Dr. See signed SEC filings containing false information. *See, e.g.,* Harvard's 1997 Form 10K-SB/A3, signed by Dr. See and claiming that the Phase I trials of its product had been completed (Ex. 2). While Dr. See claimed that his signature had been forged, he admitted that he never raised this claim with the FDA, and the Court finds the testimony to be incredible. The Court finds equally incredible Dr. See's explanation that his signatures were merely to amendments to the SEC filings, or that, because the SEC documents contained electronic signatures, his responsibility should somehow be diminished. Ms. Berry's testimony makes clear that the SEC forms would not have been filed without Dr. See's actual signature.

The Court finds in favor of Plaintiff on Count II of the

Amended Complaint.

**Count III -Violation of § 20(a) of the SEA, 15 U.S.C § 78t**

This provision imposes secondary liability on a party who controls a violator of the securities laws and who fails to show that he acted in good faith. *Borden, Inc. V. Spoor Behrins Campbell & Yound, Inc.*, 735 F. Supp. 587 (S.D.N.Y. 1990). In order to impose liability on a director under this section, the director must have at least had the potential to control the specific activity upon which the primary violation of securities laws is predicated. *Schlifke v. Seafirst Corp.*, 866 F.2d 935 (7th Cir. 1989). "A director is not automatically liable as a controlling person, although director status is a "red light' to the court." *Arthur Children's Trust v. Keim*, 994 F.2d 1390, 1396-97 (9th Cir. 1994).

RK's evidence demonstrates that Dr. See was not only Harvard's Director of Research, but that he was a long time Director, Executive Member, Chairman of the Board, and (according to Harvard's SEC filings) the founder of Harvard Scientific. At trial, Dr. See admitted that he attended the October 22, 1997 meeting with the FDA, that he was aware that clinical trials and Phase I testing had not been concluded, that Harvard's products were not ready for global shipping, and that Harvard had not reached a deal with a pharmaceutical company for a buyout or partnership. Nevertheless, Dr. See permitted Harvard to publish

press releases and file SEC statements containing contrary
information.

Dr. See attempts to shift much of the blame to Mr. Waite.
However, the Court credits the testimony of Ms. Berry and Mr.
Gorgy that, even when Mr. Waite served as Harvard's CEO, Dr. See
generally controlled Harvard[20], that his approval was
specifically required before press releases would be issued, and
that his signature was required before Harvard would file its SEC
statements. The Court concludes that Dr. See possessed the
information concerning the status of the clinical trials and all
technical data submitted and/or released by Harvard, and that he
controlled both the content of the information that Harvard
published, as well as the individuals that physically prepared
the press releases and filings. Therefore, the Court finds in
favor of Plaintiff on Count III.

**Count IV- Violation of Illinois Securities Laws, 815 ILCS 5/12-13**

The elements for recovery under the Illinois Securities Laws
generally parallel those for Rule 10b-5 violations. *Branch-Hess
Vending Services Employees Pension Trust v. Guebert*, 751 F. Supp.
1333, 1342 (C.D. Ill. 1990) (citing 15 U.S.C. 78j(b)). Because
of this, Illinois courts look to the federal securities fraud
case law in interpreting the Illinois Act. *Tirapelli v.*

---

[20] Even Dr. See admitted that he insisted that his approval
be obtained before Mr. Waite's expenses could be reimbursed.

*Advanced Equities, Inc.*, 813 N.E.2d 1138, 1142 (Ill. App. 1ˢᵗ
Dist. 2004).

To prevail under the Illinois statute, RK must prove by a
preponderance of the evidence that 1)Dr. See made a false
statement or omission of material fact; 2) that Dr. See made the
false statement with knowledge; 3) the false statement was made
in connection with the purchase or sale of securities; 4) RK
justifiably relied upon the information; and 5) RK sustained
damages as a result of its reliance. *Id.*

As the Court concluded in discussing Count I, RK has
sufficiently proven that Dr. See and Harvard knowingly made false
statements of material fact, that RK reasonably relied upon this
false information in deciding to invest in Harvard, and that RK
suffered damages as a result of this misinformation. Therefore,
the Court finds in favor of Plaintiff on Count IV.

**Count V-Common Law Fraud**

To succeed on its common law fraud claim, RK must prove the
following by clear and convincing evidence: 1) Dr. See and
Harvard made false statements of material fact; and 2) Dr. See
knew or believed the statements were false or he made the
statements in reckless disregard for whether they were true or
false. In addition, RK has the burden of proving that each of
the following statements is probably more true than not: 1) that
Dr. See made the statements with the intention to induce RK to

42

purchase Harvard stock; 2) RK reasonably believed the statements
and purchased the stock; and 3) RK's damages resulted from its
reliance on the statements made by Dr. See. *Indemnified Capital
Investments, SA. v. R.J. O'Brien & Associates, Inc.,* 12 F.3d 1406
(7th Cir. 1993). The Court has already concluded that the clear
and convincing evidence shows that Dr. See knowingly made false
statements of material fact, and he did so with the intention of
inducing investors like RK to invest in Harvard, that RK
reasonably relied upon such statements, and that RK's damages
resulted from its reliance on those statements. Therefore, the
Court finds in favor of Plaintiff on Count V.

## Count VI: Illinois Consumer Fraud and Deceptive Business Practices Act

The Court finds that RK has proven by clear and convincing
evidence that 1) Dr. See engaged in deceptive acts; 2) Dr. See
intended for RK and other investors to rely upon such deceptive
acts; and 3) the deceptive acts occurred in the course of conduct
involving trade or commerce. *Thacker v. Menard, Inc.,* 105 F.3d
382 (7th Cir. 1997). As discussed above, Dr. See knowingly
caused Harvard to make false statements for the purpose of
enticing investors, and enabling Dr. See to sell his shares of
Harvard at a profit. The Court finds in favor of Plaintiff on
Count VI.

In addition to Plaintiff's claims, the Court also evaluates

Defendant's Affirmative Defenses.

In his First Affirmative Defense, Dr. See contends that RK did not reasonably rely on any information from Dr. See in making the decision to invest in Harvard. Dr. See elicited testimony from Messrs. Krilich Sr. And Jr. demonstrating that RK's decision to invest in Harvard was motivated, in part, by a desire to "flip" the stock and make a quick profit. This admission does not negate these witnesses' other statements that they also were influenced by Harvard's optimistic press releases and SEC filings in evaluating the investment opportunity. The Court finds that Defendant has not presented sufficient evidence to succeed on his First Affirmative Defense.

In his Second Affirmative Defense, Dr. See alleges that, at no time, did he solicit Plaintiff's investment. The Court rejects Dr. See's Second Affirmative Defense as being unsupported by the law.

In his Third Affirmative Defense, Dr. See claims that RK is estopped from asserting its claims against him, because RK had unclean hands. Specifically, Dr. See alleges that Barbara Berry provided inside information to her father and brother that influenced RK's investment. However, Dr. See did not introduce any evidence that Barbara Berry forwarded improper information to RK or Messrs. Krilich Sr. or Jr.

In addition, Dr. See claims that Robert Krilich Jr.

improperly obtained inside information by secretly eavesdropping on a phone conversation between Dr. See and Mr. Waite. Dr. See claims that, during this phone conversation, he discussed Harvard's negotiations with third parties, the Harvard's progress with the FDA, and other confidential information.

Having determined that the statements purportedly made by Dr. See during this phone conversation were known by Dr. See to be false at that time, the Court can only conclude that Dr. See knew that Mr. Krilich Jr. was a party to the conversation and that he made the statements to induce the investment. In addition, Dr. See has failed to demonstrate that he revealed any information that Harvard had not already publicly disclosed via press releases or SEC filings. The Court rejects Dr. See's Third Affirmative Defense, as well.

Neither Defendant's closing argument nor his post-trial Proposed Findings of Fact make mention of his Fourth, Fifth, Sixth, Ninth, or Eleventh Affirmative Defenses, and the Court concludes that he has abandoned those Affirmative Defenses.

While Defendant's Seventh Affirmative Defense contends that this Court does not have personal jurisdiction over Dr. See, Dr. See's agreement in the pretrial order that "Jurisdiction is not disputed" and his substantive participation in this trial negate this affirmative defense.

The Court has already addressed the substance of Defendant's

Eighth Affirmative Defense that Plaintiff had unclean hands, and has rejected the defense.

Finally, the Court has already concluded that, contrary to Defendant's Tenth Affirmative Defense, venue is proper.

## Conclusion

For the reasons set forth above, the Court finds in favor of Plaintiff on Counts I, II, III, IV, V, and VI of the Amended Complaint. The Court rejects Defendant's Affirmative Defenses. Judgment is entered against Defendant Jackie R. See and in favor of Plaintiff RK in the amount of $500,000 in damages, plus costs, interest, and reasonable attorneys fees.

DATED: March 23, 2007          ENTERED:

Arlander Keys
ARLANDER KEYS

46